# STATE OF VERMONT

| SUPERIOR COURT | ENVIRONMENTAL DIVISION |

| | |
|---|---|
| **Grayson Subdivision and Conditional use Application Appeal** | **Docket No. 19-3-17 Vtec** |
| **In re Grayson Zoning Permit Application Appeal (Site Clearing)** | **Docket No. 74-6-17 Vtec** |

## AMENDED DECISION ON THE MERITS[1]

Applicant Charles T. Grayson ("Applicant"), owner of a 45.1± parcel of land on Sweet Road in Waterbury, Vermont, seeks needed municipal approvals for a proposed three-lot subdivision. When those approvals were granted by the Town of Waterbury Development Review Board ("DRB"), neighbor Glen Andersen ("Appellant") appealed to this Court.

There are two appeals from DRB approvals concerning this project. The first appeal relates to the application approved by the DRB for subdivision and conditional use approval (Docket No. 19-3-17 Vtec) and the second appeal relates to the approval sought for certain clearing of some of the subject property, in anticipation of the subdivision (Docket No. 74-6-17 Vtec). Both applications were reviewed and approved pursuant to the Town and Village of Waterbury Zoning Regulations (amend. May 16, 2016) ("Regulations").

As the parties prepared for a *de novo* trial, the Court directed that they exhaust their efforts to reach a voluntary resolution, including by employing an independent mediator. When those efforts failed, the Court thanked the parties for their efforts, and coordinated the two appeals for a joint trial.

Applicant was assisted in these proceedings by his attorney, Christopher J. Nordle, Esq.; Appellant initially appeared as a self-represented litigant, but was then assisted by Brice Simon, Esq. The Town of Waterbury ("Town") was assisted by its attorney, Joseph S. McLean, Esq.

---

[1] This Amended Merits Decision was made necessary to correct certain typographical errors here and in the Judgment Order. The Court regrets these errors in our original decision and Order. We thank Attorney Joseph S. McLean, Esq. for bringing them to the Court's attention so promptly.

The Court received all relevant testimony during a one-day trial, which was preceded by a visit to the project site and surrounding neighborhood.  After trial, the Court afforded the parties the opportunity to file proposed findings and conclusions.  When that filing deadline passed, these appeals came under advisement on February 6, 2018.  Due to other commitments and work responsibilities, the Court was delayed by several months in completing its research and drafting of this Merits Decision.  The Court offers its apologies to the parties and their attorneys for that delay.

Based upon the evidence presented at trial, including that which was put into context by the site visit, the Court renders the following Findings of Fact, Conclusions of Law, and Judgment Order that accompanies this Merits Decision.

**Findings of Fact**

**I.    Existing Neighborhood.**

1.    Applicant owns a 45.1± parcel of land along the easterly side of Sweet Road in Waterbury, Vermont.  The parking area and trailhead for one of the hiking trails to Hunger Mountain is located on a parcel of land adjacent to the northern border of Appellant's property.  Applicant's property is one of the larger remining tracts of undeveloped land in the immediate neighborhood.

2.    Appellant owns and resides at property located across Sweet Road from Applicant's property.  Appellant's home is known as "the Meadows House" and consists of a log cabin that was built in the mid-1970s.  While Appellant uses this property as a residence, he also uses it for business purposes, such as renting the property out for weddings and other events of up to 180 guests.  He also collects sap from the maple trees on his and neighboring properties and makes maple syrup.

3.    Most of the properties in the immediate neighborhood are land parcels of several acres or more.  Many of the properties nearby have been developed with single-family residences.

4.    This area has experienced a significant increase in the residential development of properties over the last 20 years.

5.    The development in the neighborhood results in regular traffic, although mostly of a rural nature. In addition to its residents, Sweet Road serves as an access point to the Hunger Mountain

Trail Head, located to the north of Applicant's property. The parcel that hosts the Hunger Mountain trail head access also hosts a parking lot, capable of serving up to thirty parked cars. During the spring, summer and fall, there are frequent visitors who use Sweet Road to access the Hunger Mountain Trail Head. Drivers also use Sweet Road as an alternate route to the neighboring Town of Stowe.

6. Sweet Road is maintained by the Town and is adequate to handle its existing and planned traffic.

7. A parcel on the westerly side of Sweet Road, south of Appellant's property, contains a medium-sized solar array. It is depicted on an aerial map admitted at trial as Exhibit D.

8. Applicant's property is located in several zoning districts. The section of Applicant's property that is within 1,000 feet of Sweet Road is located in the Medium Density Residential Zoning District ("MDR District"); the portion of Applicant's property that is located beyond 1,000 feet from Sweet Road is located in the Conservation Zoning District ("Conserv. District"). All of Applicant's property is located in an overlay district, known as the Ridgeline/Hillside/Steep Slope Overlay Zoning District ("RHS District").

9. Some wildlife, including deer, bear, amphibians and birds occasionally visit the neighborhood. However, there was no credible evidence offered at trial that Applicant's property or the immediate neighborhood hosts a critical wildlife habitat or significant wildlife corridors.

10. Where wildlife has been observed in the neighborhood, including when crossing Sweet Road, it has generally been to the north and south of Applicant's property, and not on his property. Deer and bear occasionally visit Applicant's property, but those wildlife visits did not appear to be significant.

11. There is a lengthy wooded and undisturbed area along Sweet Road north of the Hunger Mountain trail head. This undisturbed area provides significant opportunity for wildlife to cross the Road.

12. There was no credible evidence presented at trial that Applicant's property or the immediate area host identified historical sites or irreplaceable natural areas. There was also no

evidence presented that Applicant's property hosts any rare, threatened, or endangered species of plant or animal, nor that the property hosts a deer wintering area.

13.     Applicant's property hosts several Class III (unprotected) wetlands. There are no wetlands on Applicant's property that are afforded statutory or regulatory protection (i.e. Class I or Class II).

14.     Thatcher Brook runs along the rear of some neighbors' lands, to the west of Sweet Road. This Brook does not traverse or even come close to Applicant's property. No other brook, river or stream come onto or close to Applicant's property, save for the tributary referenced below.

15.     There is an unnamed tributary of Thatcher Brook that crosses under Sweet Road to the south of Applicant's property. This tributary originates to the east of Applicant's property and at times straddles the southerly boundary of Applicant's property, particularly along the rear (easterly) southern border.

16.     The area around this tributary is wooded, undisturbed by human development,[2] and is occasionally used by wildlife as a travel corridor to cross Sweet Road. This area is not located on applicant's property, but rather located on the adjoining property to the south.

17.     Some portion of this tributary may be within 50 feet of Applicant's southern boundary. Because of this, Applicant has proposed that any approval be conditioned upon any development respecting a fifty-foot buffer along either side of the tributary.

18.     Applicant's and the neighboring properties on the easterly side of Sweet Road gradually climb in elevation from Sweet Road and to the easterly rear of the parcels. Much of the development that has already occurred on these neighbors' lots has occurred relatively close to Sweet Road, where the land is somewhat level.

**II.     Applicant's Proposed Subdivision.**

19.     In his first application, which is the subject of Docket No. 19-3-17 Vtec, Applicant seeks subdivision and condition use approval for his proposed three-lot subdivision.

---

[2] Some of the existing development to the west and south of Applicant's property is close to this stream or tributary. There was no evidence presented at trial that this close proximity of existing development has deterred wildlife from crossing Sweet Road in close proximity to the tributary.

20.     Applicant's property is oddly shaped, sort of like a short-toed boot, with the heel and sole running along Sweet Road.  Travelling from Sweet Road, Applicant's property rises in elevation, with three plateaus or terraces as the property rises.

21.     Applicant proposes to divide his property into three lots, as depicted on the site maps admitted into evidence at trial as Exhibits G, H, and I.

22.     As reflected on those site maps, Lot 1, on the northern part of the property, will contain 3.9± acres; Lot 2, in the middle of the property, will contain 9.73± acres; and Lot 3, on the southern part of the property, will contain 31.53± acres.

23.     Each lot will have its own driveway access from Sweet Road on a to-be-cleared area of about 30 feet wide.  The site maps depict building envelopes on each lot, which will be used to identify where a house can be sited.

24.     Applicant proposes that any permits issued would be conditioned upon the future houses only being located within the designated building envelopes.

25.     The property is currently heavily wooded.  Clearing for the house sites will not occur until after Applicant or his successors apply for and receive development approvals.

26.     Applicant anticipates that the area between the actual house sites within the designated building envelopes and to the edge of Sweet Road will only be selectively cut, so as to provide screening of the houses, the Road, and neighboring properties.

27.     All three lots will be served by a common wastewater treatment system that will be located on Lot 3.  Easements will be conveyed with the individual lots to allow for the installation and maintenance of the waste lines and disposal system.

28.     The Zoning Regulations require that newly created lots in the MDR District must contain 2 acres or more, must have at least 200 feet of road frontage, and must respect a 60-foot front and 50-foot side and rear yard setback minimums.  Lots 1 and 2 are wholly within the MDR District.  The building sites on Lot 3 are also entirely located within the MDR District.

29.     Newly created lots within the Conserv. District must contain 10 acres or more, must have at least 300 feet of road frontage, and must respect 100-foot front, side and rear yard setback minimums.  Lot 3 (the only lot to be in the Conserv. District) conforms to these zoning district dimensional requirements.

30.     All three lots are within the RHS Overlay District.

31.     In his second application, which is the subject of Docket No. 74-6-17 Vtec, Applicant seeks authority to do some clearing work on Lots 1 and 3. The work on Lot 1 will consist of the clearing necessary for laying out the driveway. On Lot 3, the work will consist of the clearing necessary for the driveway, the community wastewater treatment system, and a force main.

32.     The site clearing work will be limited to daylight hours during the work days. Noise from the planned clearing work is not anticipated to produce gas, dust, smoke, or vibration that would cause an undue adverse impact to the neighborhood.

33.     Erosion protection and sediment control measures will be implements during the initial clearing work and during any future development on the Lots.

34.     No approval has been sought in the pending applications for the houses that may be placed on each of the three lots. Applicant acknowledged that such approvals will need to be secured before any actual construction may begin.

35.     Applicant has identified possible building sites on each of the three lots by delineating "building envelopes"; there is one building envelope on Lot 1 and two building envelopes on each of the remaining Lots. Little to no clearing will occur outside of these building envelopes, save for clearing necessary for the driveways, community wastewater treatment system, and associated utility lines.

36.     The rear half of Lot 3 is heavily wooded; the rear portion of Lot 3 is adjacent to land owned by the State of Vermont and identified as the Northern Hardwood Forest. Applicant proposes that all development would be prohibited on the rear portion of Lot 3, consisting of 14.65± acres, and would be protected by a conservation easement. This protected area is identified on Exhibit H and detailed in the report of Applicant's environmental consultant, admitted into evidence as Exhibit K.

37.     Because the proposed subdivision has been represented as being only for residential purposes, it is not anticipated that the subdivision, if approved, and eventual development will cause any more noise or off-site lighting than flows from the other already existing neighboring residences.

**Conclusions of Law**

Given that both of the pending appeals are to be considered by this Court on a *de novo* basis, we begin our analysis by noting that we must adjudicate the factual and legal issues presented by an appellant's statement of questions without regard to the prior determinations made by the appropriate municipal panel ("AMP") from which the appeal arose. Conversely, the AMP's factual and legal determinations <u>not</u> challenged by an appellant are deemed final and become the law of the case. <u>Vill. of Woodstock v. Bahramian</u>, 160 Vt. 417, 424 (1993). This procedural reality causes us to limit our review of the applications presented in the two pending appeals to the challenges presented in Appellant's Statement of Questions in each Docket. Some of the Questions presented in each appeal are similar. Nonetheless, we begin our review with the Questions presented in the appeal first taken.

I. **Appeal from subdivision and conditional use determinations (No. 19-3-17 Vtec).**

Appellant filed his Amended Statement of Questions on August 4, 2017.[3] While Appellant's Statement contains twelve Questions, several of those Questions contain overlapping issues. We therefore have organized our review in light of the expressed overlapping concerns.

a. **Impacts upon Appellant's maple sugaring operations.**

Appellant's Amended Questions 1 and 3 assert that the proposed subdivision may have an impact, and an "undue adverse impact," upon Appellant's maple sugaring and farming operations. In presenting these two Questions, Appellant relies upon the verbiage used in the Regulations, specifically Regulations § 303(e)(2)(C). However, it was unclear from the evidence presented that Appellant currently has any form of a maple sugaring or farming operation, or how the proposed subdivision could have any sort of impact upon those operations. There was no evidence presented that Appellant's supposed maple sugaring and farming operations are conducted on or adjacent to Applicant's property. The was also no evidence presented as to how the proposed subdivision could impact upon Appellant's operations, if they do still exist. We therefore answer Appellant's Question 1 in the affirmative, by concluding that Applicant's

---

[3] Appellant filed his Amended Statement of Questions in response to Applicant's motion to dismiss, strike, or clarify his original Statement of Questions. See <u>In re Grayson Subdivision App.,</u> NO. 19-3-17 Vtec (Vt. Super. Ct. Envtl. Div. Nov. 7, 2017) (Durkin, J.).

-7-

proposed subdivision complies with Regulations § 303(e)(2)(C), and answer Appellant's Question 2 in the negative, by concluding that Applicant's proposed subdivision will not have an undue adverse impact in regard to Appellant's maple sugaring and farming operations.

### b. Impacts upon the character of the area.

Appellant's Amended Question 2 asks generally whether the proposed "development"[4] will have an undue adverse impact upon the character of the area. Appellant asks by his Amended Question 4 whether the proposed subdivision, due to its "general scale and size . . . is consistent with the agricultural, conservation, and recreational zoning within the immediate surrounding area . . . [as protected by Regulations] Section 303(e)(2)(C) or Section 1202(a)(2) . . . ." For the reasons stated below, we conclude that the proposed subdivision will not have an undue adverse impact upon its neighborhood and will conform to the cited Regulations.

The existing neighborhood has already experienced consistent development, particularly within the last twenty years. That development consists entirely of residential development on medium to large-sized lots, with the exception of Appellant's property, where Appellant has introduced commercial uses. The trail head and parking area for access to the Hunger Mountain trails on the lot to the north of Applicant's property brings a consistent stream of visitors to the neighborhood during the spring, summer and fall. We received no reports at trial that these visitors and their use of the lot adjoining Applicant's property conflicted with the rural residential character of the area.

To this setting, Applicant proposes to subdivide his property into three lots of 3.9± acres, 9.73± acres, and 31.53± acres. Applicant proposes to locate the building sites for the future development of the subdivided lots near Sweet Road, where the land is relatively flat, and proposes to prohibit development or other disturbances on the steeper lands, as the property travels away from the Road. In the whole gambit of possible development activities, including more condensed development, we cannot imagine a subdivision proposal that would be more aligned with the existing area uses. We conclude that the proposed development compliments,

---

[4] We note that Applicant currently proposes no "development" for his property and, in fact, confirmed during trial that he may not commence any development upon any of the proposed three subdivided lots unless and until he applies for and receives developmental approval. We therefore interpret Appellant's Question 2 as asserting that the proposed *subdivision* may have an undue adverse impact upon the character of the area.

and does not adversely impact, the character of the area. We therefore answer Question 2 in the negative, because the subdivision will not have an undue adverse impact, and Question 4 in the affirmative, because the subdivision is consistent with zoning in the immediate area.

Amended Questions 5 and 6 express overlapping concerns about storm water runoff and erosion. Specifically, these Questions ask:

> 5. Whether the proposed development plan makes adequate provisions for the control of runoff and erosion, as well as surface water flow patterns during and after any future construction.

> 6. Whether the proposed development's anticipated storm water runoff would cause an undue adverse impact on the character of the area, and whether the state and local storm water runoff requirements have been met.

Appellant's Amended Statement of Questions, filed Aug. 4, 2017, at 1.

Appellant's Questions are off the mark, in two regards. First, Question 5 asks this Court to consider impacts of "future construction." To the extent that Appellant is asking us to anticipate what may occur during the future construction of homes, we decline to do so, given that future development of the homes has not been detailed for us in these applications, and Applicant has acknowledged that no development may occur until after he applies for and the DRB considers and approves building permits. Thus, we focus our analysis to the impact that may flow from the subdivision and partial clearing detailed in the pending applications.

By his Question 6, Appellant asks "whether state and local storm water runoff requirements have been met." We have searched the Regulations that govern the pending applications and find no requirement that an applicant show that his proposed development conforms with state storm water regulations. Our search also did not find a portion of the Regulations that is titled "storm water runoff requirements." However, the Regulations governing conditional uses does require that an applicant show that the proposed project "[w]ill not result in undue water pollution, undue adverse impacts to downstream properties, and will not cause unreasonable soil erosion or reduction in the capacity of the land to hold water so that a dangerous or unhealthy condition may result . . .." Regulations § 303(e)(2)(A). Similarly, the Regulations governing subdivisions direct that a proposed subdivision must be shown to "not result in an undue adverse impact to water quality or downstream properties, and will not cause undue adverse impacts to soil through erosion or reduction in the capacity of the land to hold

-9-

water." Regulations § 1202(a)(3). We therefore review the proposed subdivision and site clearing within the scope of these Regulations.

Applicant presented credible, and for the most part unchallenged, testimony and other evidence that showed that his proposed subdivision and site clearing will have no such undue adverse impacts. His engineer and environmental consultant provided details of the stormwater and erosion control measures that will be employed. There is no clearing or future development planned for the steep slopes on Applicant's property, and the planned site clearing will only be on a small portion of the total area. There are also no protected wetlands on the property. To the extent that the tributary that runs along the southern boundary of Lot 3 should be regarded as a protected stream, Applicant proposes an adequate buffer of 50 feet to protect that tributary.

Appellant presented no evidence of adverse impacts; he merely articulated his concerns. But with no factual foundation for those concerns, we cannot adopt them.

For all these reasons, we answer Appellant's Question 5 in the affirmative, concluding that Applicant has made adequate provisions for the control of any runoff, erosion, and surface water flows. Similarly, we Answer Appellant's Question 6 in the negative, concluding that any storm water runoff resulting from Applicant's proposed subdivision and site clearing will not result in any undue adverse impacts.

By his Question 7, Appellant asks whether the proposed subdivision and site clearing will cause "an undue adverse impact on downstream properties, especially considering the high percentage of lands over 25% in slope." Appellant's Statement of Questions, filed Aug. 4, 2017, at 1. While it is true that the rear portion of Applicant's property has steep slopes, he proposes no development for that portion of his property. In fact, he has suggested a prohibition on any future development in that area, and intends to encumber that land with a conservation easement.

The steep-sloped areas are heavily wooded. Therefore, stormwater runoff from this area is highly unlikely. More to the point of our analysis, there is nothing that Applicant is proposing that would change the ability of this portion of his lands to contain stormwater runoff. We therefore answer Appellant's Question 7 in the negative.

By his Question 8, Appellant asks whether "the project would have an undue adverse impact on wildlife habitat, wildlife corridors, and natural areas, considering the natural conditions and areas of development surrounding" Applicant's land. Id.

"Wildlife travel corridors" and "significant natural resources" are terms defined by the Regulations. See Regulation § 1400. The Regulations governing conditional uses and subdivisions require that a proposed project not have an undue adverse impact upon "irreplaceable natural areas" or upon "significant natural resources." Regulations §§ 303(e)(2)(C) and § 1202(a)(3). But there was no evidence presented at trial of any impacts upon such areas or resources. The evidence convinced us that while wildlife does travel through this neighborhood, as wildlife usually does in most rural Vermont residential areas, there were no wildlife travel corridors identified on Applicant's property and there was no evidence presented that the proposed subdivision and site clearing would have any impact upon wildlife travel corridors that may exist to the north and south of Applicant's property. Some of the most convincing evidence of a lack of impact is that wildlife continues to visit the neighborhood, even after the increase of residential development over the last twenty years. Applicant's three-lot subdivision closely simulates the existing neighborhood development.

Because of this credible evidence, we answer Appellant's Question 8 by concluding that the proposed subdivision and site clearing will not have an undue adverse impact upon wildlife habitat, wildlife corridors, or natural areas.

By his Question 9, Appellant asks whether Applicant "failed to sufficiently consider the destruction of, and would have an undue adverse impact upon, a vernal pool, fox dens or raptor habitat, or other wildlife habitat" on the to-be-subdivided property. However, Appellant presented no evidence at trial of such destruction or undue adverse impact. Trial evidence did convincingly show that Applicant has thoughtfully considered possible impacts to visiting wildlife and the tributary near his southern boundary. We therefore answer Appellant's Question 9 in the negative.

Appellant's Question 10 appears to be repetitive, since it asks whether Applicant's proposed subdivision and site clearing meets "the conditional use criteria referenced herein." By the phrase "referenced herein," we presume that Appellant is referencing the conditional use

-11-

criteria already challenged in his Statement of Questions. However, as a precaution, we review the project's conformity with all the applicable conditional use criteria, which are detailed in Regulations § 303(e).

1. Applicant's proposed subdivision is adjacent to the Hunger Mountain trail head parking area, which can accommodate up to 30 car loads of visitors to this neighborhood. There are twenty or more existing homes in the neighborhood, located on medium to large tracts of land. There was no testimony offered that Sweet Road is having difficulty accommodating the traffic from these existing uses, nor was there any testimony that the addition of three lots intended for residential development will have any adverse impact on the ability of Sweet Road to maintain its current level of service for its travelers. We therefore conclude that the proposed subdivision conforms to Regulations § 303(e)(1)(A) ("Will not cause the level of service on roads and highways to fall below a reasonable standard").

2. The proposed subdivision will not require connection to municipal water or sewer systems. It therefore will not cause an "unmanageable burden" on those systems and therefore conforms to Regulations § 303(e)(1)(B).

3. The proposed subdivision is unlikely to add more than a few children to the area school system. There was no evidence presented that the area school system is unable to accommodate this relatively small increase in school-aged children. We therefore conclude that the proposed subdivision conforms to Regulations § 303(e)(1)(C) ("Will not lead to such additional school enrollments that existing and planned school system capacity is exceeded").

4. The proposed subdivision will not create or contribute to an unmanageable burden on the area's fire protection services. It therefore conforms to Regulations § 303(e)(1)(D).

5. This small, three-lot subdivision will not have an impact upon the municipal plans for growth, service standards, or facility construction plans. It conforms to Regulations § 303(e)(1)(E).

6. We have previously reviewed the proposed subdivision's conformance with Regulations § 303(e)(2)(A). It will not result in undue water pollution, any undue adverse impacts upon downstream properties, nor cause unreasonable soil erosion or reduction in the capacity of the land to hold water.

7. There was no evidence presented that the proposed subdivision will cause undue noise, light or air pollution (including offensive odors, dust, smoke, or noxious gases). It conforms to Regulations § 303(e)(2)(B).

8. We have already concluded that the proposed subdivision conforms to Regulations § 303(e)(2)(C). As proposed this subdivision will complement and not have an undue adverse effect on the scenic and natural beauty of the area. As previously stated, there were no historic sites, or rare or irreplaceable areas that will be impacted by this proposed

subdivision. For all these reasons, we reaffirm our conclusion that the project conforms to Regulations § 303(e)(2)(C).

9. The scale and design of this proposed subdivision and the location of the building sites on the individual lots are consistent with the existing uses of properties in the immediate area. Its scale and design comport with that of its neighborhood. We therefore conclude that the proposed subdivision conforms to Regulations § 303(e)(2)(D).

10. The project as proposed will not cause a danger of fire, explosion, or electrical hazard; there was no evidence presented that it will jeopardize the health or safety of the area. The project as proposed conforms to Regulations § 303(e)(2)(E).

11. The proposed subdivision does not violate any municipal bylaws or ordinances. It conforms to Regulations § 303(e)(3).

12. The proposed subdivision conforms to the applicable zoning district requirements as to lot size, setbacks, and lot coverage requirements. We therefore conclude that it conforms to Regulations § 303(e)(4).

Because the proposed subdivision will comply with all the applicable conditional use criteria detailed in Regulations § 303(e), we answer Question 10 in the affirmative.

We are perplexed by Appellant's Amended Question 11, which asks "[w]hether the project constitutes impermissible incremental development, and the development plan should be required to account for the maximum impacts contemplated." We have searched in vain for criteria in the Regulations that use these phrases. The project consists of a modest proposal for development of a 45.1± acre tract of land, dividing the parcel into three lots. Much of the land is in the MDR District, which allows for the creation of lots containing two or more acres. We received no credible testimony that the proposed subdivision should be regarded as an "impermissible incremental development," nor could we find language in the Regulations that would authorize us to make that assessment. We therefore answer Appellant's Amended Question 11 in the negative.

Appellant's final Question in this appeal, Amended Question 12, asks whether "conditional use approval should be denied because the proposed subdivision of land and contemplated development will result in undue adverse impacts, such as bifurcation of habitat, degradation of surface water, and over-development of a sensitive natural area adjacent to land conserved by the State of Vermont." Appellant's Statement of Questions, filed Aug. 4, 2017, at 2. We were presented with no credible evidence to support these accusations. There was no

evidence presented of undue adverse impacts, as noted above.  We therefore answer Appellant's Amended Question 12 in the negative.

Given the above conclusions in response to the factual and legal challenges presented in Appellant's Amended Statement of Questions, we conclude that Applicant's requests for subdivision and conditional use approval of his proposed subdivision should be granted.  We therefore **AFFIRM** the DRB approvals of February 3, 2017, identified as Decision #79-16T.

II.     **Appeal from approval for clearing of some of the subject property (No. 74-6-17 Vtec).**

When Applicant decided to revise his plan for the initial site clearing work, he filed an application for a zoning permit for that revised site clearing on Lots 1 and 3.  When the DRB approved that zoning permit request, Appellant filed an appeal and initiated the second appeal concerning this project.  That second appeal was assigned Docket No. 74-6-17 Vtec and coordinated with the first appeal for a joint trial.

Appellant filed a Statement of Questions in this second appeal on July 13, 2017.  Many of the Questions posed in this second appeal are identical to the Questions posed in Appellant's Amended Statement of Questions from the first appeal.  To the extent that Appellant's Questions here pose identical factual and legal challenges as the Amended Questions that we have already addressed, we rely upon our prior analysis and conclusions to address those Questions here.

Our review of the Statement of Questions in this second appeal reveals the following:

- Questions 1 through 4 are identical to Appellant's Amended Questions 1 through 4 in the first appeal.  We therefore reach the same conclusions for these Questions.

- Appellant's Question 5 challenges the identity of the applicable zoning districts. Appellant withdrew this Question at trial.

- Question 6 is identical to Appellant's Amended Question 5 in the first appeal.  We therefore reach the same conclusion for that Question.

- Question 7 is identical to Appellant's Amended Question 6 in the first appeal.  We therefore reach the same conclusion for that Question.

- Question 8 is identical to Appellant's Amended Question 7 in the first appeal.  We therefore reach the same conclusion for that Question.

- Question 9 is identical to Appellant's Amended Question 8 in the first appeal.  We therefore reach the same conclusion for that Question.

- Question 10 is identical to Appellant's Amended Question 9 in the first appeal.  We therefore reach the same conclusion for that Question.

- Question 11 is identical to Appellant's Amended Question 10 in the first appeal. We therefore reach the same conclusion for that Question.

- Question 12 is identical to Appellant's Amended Question 11 in the first appeal. We therefore reach the same conclusion for that Question.

Having answered all Questions in this second appeal in Applicant's favor, we conclude that Applicant's request for a zoning permit authorizing his revised site clearing plan should be granted. We therefore **DENY** the appeal and **UPHOLD** the DRB approval of May 17, 2017, identified as Decision #15-17.

A Judgment Order accompanies this Merits Decision. This completes our current review concerning these appeals.


Electronically signed on July 12, 2018 at Newfane, Vermont, pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Superior Judge
Environmental Division